UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERICKA LEE, as personal                         Case No. 16-13116
representative of the ESTATE OF
JOSEPH LEE,                                     Arthur J. Tarnow
                                                United States District Judge
          Plaintiff
v.                                              Stephanie Dawkins Davis
                                                United State Magistrate Judge
GENESEE COUNTY, *et al*,

          Defendants.
_____/

## REPORT AND RECOMMENDATION
## MOTION FOR SUMMARY JUDGMENT (Dkt. 56)

## I.    PROCEDURAL HISTORY

Plaintiff filed this prisoner civil rights action on behalf of her decedent,

Joseph Lee on August 29, 2016.  (Dkt. 1).  On October 14, 2016, the matter was

referred to the undersigned for all pretrial proceedings.  (Dkt. 19).  After discovery,

defendants Deputy Steve Little and Genesee County filed a timely motion for

summary judgment.  (Dkt. 56).  On December 22, 2017, plaintiff filed a response.

(Dkt. 62).  The parties filed their joint statement of resolved and unresolved issues

on February 21, 2018.  (Dkt. 64).  A hearing was held, pursuant to notice.  (Dkt.

59).  With permission, and without objection from defendants' counsel, plaintiff

filed a supplement after the hearing regarding the testimony from Deputy Little.

(Dkt. 65).  This matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED**.

## II.    FACTUAL BACKGROUND

Joseph Lee, at 77 years old, died while in the custody of the Genesee County Jail on July 21, 2015.  He was initially incarcerated earlier that year on March 3, 2015, then released and reincarcerated two more times.  Mr. Lee was in the jail between March 3 and May 7, 2015, then again from May 22 to June 11, 2015, and finally again from July 2 until July 21, 2015.  Thus, all told, he spent about three and a half months in the Genesee County jail.  (Dkt. 56-1, Ex. A, Marsh investigation report).  Genesee County maintains a contract with Corizon Health, Inc. to staff the jail with nurses and doctors to treat inmates.  (Dkt. 56-2, Ex. B, Corizon Contract).  When Mr. Lee arrived at the jail, he underwent a health physical and an initial medical evaluation by Corizon personnel.  (Dkt. 56-3, Ex. C, Corizon initial intake documents).  Mr. Lee disclosed that he had asthma and hypertension, and that he previously had cancer.  Mr. Lee did not disclose any history of cardiovascular disease.  *Id*.  Mr. Lee was housed on a medical floor, where the jail lodged elderly inmates, inmates with injuries, and inmates with mental deficiencies.  (Dkt. 58-3, Ex. B, p. 9).

During Mr. Lee's time in the jail, he received regular medical treatment from Corizon staff.  Between March 7 and July 19, the last date he was seen by

medical personnel before he died, he was in the medical department 11 times.  He complained about a possible hernia, swelling in his ankles, joint pain, elbow pain, stomach pain, dry skin, a cold, and back pain.  (Dkt. 56-3, Ex. C, problem list; Dkt. 56-4, Ex. D, Corizon medical records).  Defendants also highlight a few recurring issues found in the medical records.  Mr. Lee refused to eat the food (because he could not eat the seasoning); he was weak and losing weight; and on occasion, he appeared to be confused.  (Dkt. 56-4, Ex. D, Pg ID 771).  According to defendants, Corizon's records demonstrate that he was seen regularly by medical staff, including nurses and a doctor; that they were aware of his condition; and that they were treating him.  On May 5, Mr. Lee was taken to the medical department for observation because he was not eating.  On May 6, he was found to have a decreased appetite, to be losing weight, and to have an "overall condition decline." On May 7, he was weak, not drinking, and seemed confused.  On that same date, Corizon staff sent him to Hurley Hospital to be evaluated because he was getting dehydrated.  *Id*.  Subsequent communications with Hurley show that he continued to experience weakness and to appear confused.  By May 12, after being at Hurley for seven days, he was dehydrated and had acquired pneumonia.  He recovered and was returned to jail on May 22.  On June 6, he again reported that he was weak. Then, the only nursing note between June 6 and July 21 was on July 19, when he complained of stomach pain.  (Dkt. 56-5, Ex. E, Corizon nursing notes).

On July 21, 2015, Deputy Little was working in the jail, on duty in the area where Mr. Lee was housed.  He maintains that he never saw any of Mr. Lee's medical records and knew nothing about Mr. Lee's medical history, or whether Mr. Lee was suffering from any chronic medical conditions.  He also did not know any details about Mr. Lee's complaints to Corizon, or what Corizon was doing to treat Mr. Lee.  (Dkt. 56-6, Ex. F, Deputy Little dep., pp. 44, 48, 58-59).  Deputy Little did know who Mr. Lee was, that he did not eat well, and that he complained generally of weakness.  He also knew that Corizon had been prescribing protein shakes to Mr. Lee for his weakness.  Deputy Little assumed that this simply was due to Mr. Lee's age.  *Id*. at 58-59.

As a rule, the deputy on duty where Mr. Lee was lodged checked on the inmates regularly and recorded complaints and observations in a log.  Deputy Little testified that it was customary for him to review the log from the night before when he arrived on duty.  (Dkt. 56-6, Ex. F, Deputy Little dep., pp. 17, 30-31).  Hence, at a minimum he would have seen what was written by the on-duty deputy from the previous shift.  (Dkt. 56-7, Ex. G).  According to defendants, it is less clear whether, when Deputy Little reported for work in the early morning of July 21, he would have seen all of the previous entries.  Nevertheless, defendants posit that, for the purposes of this motion, the Court can assume that Deputy Little was generally aware of what other deputies had previously written about Mr. Lee.   The

4

observation log begins on July 7.  (Dkt. 56-7, Ex. G).  On July 9, it indicates that

Mr. Lee had trouble eating breakfast.  *Id*.  On July 11, Mr. Lee reported that he was

not feeling well, and the deputy who was on duty contacted Corizon.  *Id*.  There is

a corresponding entry in Corizon's medical records.  (Dkt. 56-4, Ex. D).  On July

14, it states that Mr. Lee ate very little and slept most of the day.   (Dkt. 56-7, Ex.

G).  On July 19, Mr. Lee complained "of feeling terrible and like he was going to

feint (sic)."  The deputy on staff contacted a nurse, who evaluated Mr. Lee.  *Id*.

There is a corresponding note in Corizon's medical records.  (Dkt. 56-4, Ex. D).

Finally, the last entry before Mr. Lee died was made the day before, on July 20.  It

indicates that Mr. Lee complained that he "dont feel good [sic]."  (Dkt. 56-7, Ex.

G).

Deputy Little testified that before July 21, Mr. Lee had never personally

complained to him about any type of medical problem, and had never asked

Deputy Little for any medical help.  (Dkt. 56-6, Ex. F, Deputy Little dep. at 59).

Defendants say that testimony is consistent with the observation log.  (Dkt. 56-7,

Ex. G).

On the morning of July 21, at approximately 10:00 a.m., according to

Deputy Little, Mr. Lee yelled for help.  (Dkt. 56-6, Ex. F, Deputy Little dep., p.

46).  Deputy Little responded and observed that Mr. Lee had defecated in his pants.

(Dkt. 56-6, Ex. F, Deputy Little dep., p. 46).  Deputy Little testified that this is not

an unusual occurrence in the jail.  *Id*. at 48, 60.  He offered Mr. Lee a shower and clean clothes; he let Mr. Lee out of his cell, and enlisted inmate housing unit workers to help Mr. Lee to the shower.  When Mr. Lee got out of the shower, he stumbled.  Mr. Lee seemed weak and had trouble walking.  (Dkt. 56-8, Ex. H, Deputy Little incident report; Dkt. 56-6, Ex. F, Deputy Little dep., pp. 46-51, 60-67).  Plaintiff asserts that as Andrew Farley, one of the inmate housing unit workers, helped Lee sit in a chair, Mr. Lee "fainted" from the chair onto the floor. (Dkt. 58, p. 2).  However, Mr. Farley's interview statement does not mention anything about "fainting."  (Dkt. 58-5, Ex. D).[1]  Mr. Farley did observe Mr. Lee fall twice - once when getting out of the shower and once after being seated in a chair.  *Id*.  Plaintiff also asserts that Deputy Little "instructed Miller and Farley to tie Lee down in a restraint chair" and take him back to his cell.  (Dkt. 58-5, p. 2). However, Mr. Farley's statement only says that, "under the direction of Deputy Little," he and Mr. Miller "then used the restraint chair to wheel Lee from the shower back to cell number five."  (Dkt. 58-5, Ex. D).  The interview notes do not contain language indicating that Mr. Lee was "tied" to the restraint chair.

Plaintiff maintains that Deputy Little was aware that Mr. Lee was having problems earlier than 10 a.m.  According to the interview of inmate Paul Miller

---

[1] As part of the investigation after Mr. Lee's death, Sgt. Michael Marsh interviewed Andrew Farley, a housing unit worker, on July 27, 2015 and prepared a narrative report of that interview.  (Dkt. 58-5, Ex. D).

conducted by Sgt. Kariann Nelson on July 23, 2015, Mr. Miller heard Mr. Lee

knocking on his cell door between 8-9 a.m. and said he was having "trouble."

(Dkt. 58-5, Ex. D).  Mr. Miller approached Mr. Lee's cell and could see through

the window that Mr. Lee was sitting on the toilet.  Mr. Miller thought Mr. Lee was

having trouble going to the bathroom and informed Deputy Little of the situation.

*Id.*

At approximately 10:20 a.m., according to Mr. Miller's statement, Mr.

Farley and Mr. Miller wheeled Mr. Lee back to his cell, laid him on the bunk, and

covered him with a blanket.  (Dkt. 58-5, Ex. D).  However, the record lacks clarity

about when Mr. Lee was taken to his cell and by whom.  Deputy Little testified

that he believes he returned Mr. Lee to his cell around 10 a.m., but Deputy Little

also testified that 10 a.m. was when Mr. Lee was yelling for help, had defecated in

his pants, and was taken to the shower.  (Dkt. 56-6, Ex. F, pp. 46, 48, 50, 63).  Mr.

Miller's statement does not mention that Deputy Little was with him and Mr.

Farley when they wheeled Mr. Lee back to his cell at 10:20 a.m.  (Dkt. 58-5, Ex.

D).  Thus, Deputy Little's testimony is a bit confusing and inconsistent on these

points, and differs in some respects from his contemporaneous report of the

timeline.  (Dkt. 56-8, Ex. H).  At the hearing on this motion, plaintiff's counsel

maintained that Mr. Lee was returned to his cell at 10 a.m. and that it was wrong

for Deputy Little  not to call for medical help at that time.  This confusion about

the timeline also leads to a disagreement about what happened at 10:25 a.m.  At the hearing, defendants' counsel maintained that Deputy Little took Mr. Lee back to the cell at 10:25 a.m. and called Nurse Bexton at that point, when he observed that Mr. Lee did not seem like himself.  More particularly, at 10:25 a.m., Deputy Little conducted a floor check.  (Dkt. 58-6, Ex. E, Pg ID 909).  At that time, according to Deputy Little's incident report, he thought Mr. Lee did not seem like himself, so he contacted John Bexton, the Corizon nurse who was on shift.  (Dkt. 56-8, Ex. H, Deputy Little incident report; Dkt. 56-6, Ex. F, Deputy Little dep., pp. 46-51, 60-67).  Deputy Little says he made the phone call at about 10:25 a.m., about 25 minutes after he first encountered Mr. Lee that morning.  (Dkt. 56-8, Ex. H). Nurse Bexton arrived about five minutes later, around 10:30 a.m.  Deputy Little left Mr. Lee's cell to open the doors to the department and let nurse Bexton into the cell.[2]  When he returned to Mr. Lee's cell with nurse Bexton, he says that Mr. Lee's condition had changed.  Mr. Lee's pulse was weak, his respiration was shallow, and he did not respond to nurse Bexton.  Nurse Bexton left to consult with his supervisor in the medical department.  (Dkt. 56-8, Ex. H; Dkt. 56-6, Ex. F, p. 51).  Nurse Bexton returned 10 minutes later, at about 10:40 a.m. with a plan for nurse Bexton to take Mr. Lee to the medical department for further evaluation and

---

[2] There is no information in the record characterizing the distance between Mr. Lee's cell and the entrance to the department, or the amount of time that transpired between Deputy Little's departure to let Bexton in and their return to Mr. Lee's cell.

observation.  However, when Deputy Little and nurse Bexton returned[3] to Mr.

Lee's cell, they observed Mr. Lee experiencing what they believed to be a seizure.

Deputy Little called a code blue[4] at 10:43 a.m.  (Dkt. 56-8, Ex. H).

According to the investigation report, Mr. Lee was transported by

ambulance to Hurley Hospital, and was in cardiac arrest on his arrival at Hurley.

(Dkt. 56-1, Ex. A).   The medical personnel at Hurley successfully resuscitated Mr.

Lee.  (Dkt. 56-1, Ex. A; Dkt. 56-9, Ex. I, death scene investigation report).

However, Mr. Lee passed away later that night, at around 6:39 p.m.  (Dkt. 56-1,

Ex. A; Dkt. 56-9, Ex. I).  His cause of death was atherosclerotic cardiovascular

disease.  (Dkt. 56-10, Ex. J, autopsy report).  Defendants say that Mr. Lee never

disclosed any heart problems to Corizon and never complained of heart problems

to Deputy Little.

The Genesee County jail policy is that deputies who are aware that an

inmate is having medical problems must inform Corizon.  (Dkt. 56-11, Ex. K,

Gould Affidavit).  If an inmate complains of a health-related issue, the Deputies

are to notify Corizon.  Also, if the Deputies observe a medical condition, they are

---

[3] The records indicate that Deputy Little left at the same time as nurse Bexton and returned with nurse Bexton.  (Dkt. 56-8, Ex. H, Pg ID 817-818).  Deputy Little testified that he had to let nurse Bexton into and out of the department where Mr. Lee was housed and that he did not remain in the cell with Mr. Lee after leaving him to let Bexton out of the department, but rather went back to his desk to await Bexton's return.  (Dkt. 56-6, Ex. F., pp. 66-67).

[4] "Code blue" is a medical emergency.  (Dkt. 56-1, Ex. A, p. 2).

trained to notify Corizon.  In short and in sum, Genesee County Deputies are trained to notify Corizon if there are any medical problems.  *Id*.  According to defendants, Deputy Little's training was consistent with the above policies of the Genesee County Jail.  (Dkt. 56-6, Ex. F, pp. 53-54).  Deputy Little testified that he attended the corrections academy.  He testified that he also had been to refresher courses every few years, and that he received on-the-job training from his superior officers.  He further testified that he was consistently taught – during the academy, during the refresher courses, and on the job – to notify Corizon in the event of a medical problem.  (Dkt. 56-6, Ex. F, Deputy Little dep., pp. 6-7, 9-11, 13, 55, 57, 68-69).  Defendants assert that Deputy Little's training records support his testimony.  They indicate that the Academy curriculum included 160 hours of training, including modules related to correctional law, first aid, prisoner behavior, and suicide awareness, all of which address inmate medical care.  They further reveal that in April 2015, only a few months before Mr. Lee died, Deputy Little completed a 90 hour refresher course which updated the materials he had received in the academy.  Finally, the records reflect that he re-certified on First Aid on July 19, 2015, two days before Mr. Lee died.  (Dkt. 56-12, Ex. L, Deputy Little's training records).

## III.   ANALYSIS AND CONCLUSION

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party

opposing a motion for summary judgment must make an affirmative showing with

proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find

for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate

the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477

U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party.  *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case.  *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence.  *See id.* at 252-53.  Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

     B.   <u>Eighth Amendment</u>

        1.    Legal Standards

In this case, it appears that plaintiff was a pretrial detainee during the time he was at the Genesee County Jail. (*See generally*, Dkt. 58-4, Case Report; Dkt. 56-6, Little Dep. at p. 45 referencing "unsentenced felony"). Thus, the applicable constitutional provision is the Due Process Clause of the Fourteenth Amendment (rather than the Eighth Amendment). *See Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002). Nevertheless, the Eighth Amendment's protection against cruel and unusual punishment extends to pretrial detainees through the Fourteenth Amendment's Due Process Clause, *Whitley v. Albers*, 475 U.S. 312, 327 (1986) and thus claims by pretrial detainees challenging conditions of confinement are analyzed under the Eighth Amendment. *See Thompson v. Cnty. of Medina*, 29

13

F.3d 238, 242 (6th Cir. 1994); *see also Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494-95 (6th Cir. 2008) (asserting that the same deliberate-indifference inquiry applies under the Fourteenth Amendment as under the Eighth Amendment).

In the context of medical care, a prisoner or pre-trial detainee's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted).  Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment.  *Estelle*, 429 U.S. at 106.  A viable Eighth Amendment claim has two components, one objective and the other subjective.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. Courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9. A plaintiff can demonstrate that a medical need is sufficiently serious by showing that it is " 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Baynes v. Cleland*, 799 F. 3d 600 (6th Cir. 2005), quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008); *See also*, *Blackmore v. Kalamozoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004). In the case of a non-obvious, i.e. latent, medical injury which has also not been previously diagnosed and prescribed treatment, a plaintiff can meet the objective prong by showing that a delay in treatment of symptoms caused a serious medical injury. *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013); *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837. In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40). "Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes a residual injury that could have been prevented with timely attention." *Lewis v. Corr. Med. Servs.*, 2009 WL 799249, at *2 (E.D. Mich. Mar. 24, 2009).

### 2.     Deliberate Indifference

Defendants argue that while, in retrospect, it is plain that Mr. Lee suffered from a serious heart condition, Deputy Little was unaware of the condition and Mr. Lee's medical need was not otherwise obvious. (Dkt. 56, p. 12). Plaintiff argues that there is sufficient evidence in the record to dispute this contention. The undersigned agrees. An inmate's symptoms, combined with the observations of other inmates and plaintiff's own medical complaints may be sufficient to demonstrate an obvious serious medical need. Such was the case in *Phillips v.*

*Roane Cnty., Tennessee*, 534 F.3d 531 (6th Cir. 2008).   In *Phillips*, plaintiff's

decedent was a pretrial detainee in the county jail who died of untreated diabetes

while housed there.  Prior to her death, Ms. Phillips had been found unconscious in

her cell with no pulse, but she regained consciousness before paramedics arrived.

After this episode, fellow inmates observed that Ms. Phillips continued to walk

very slowly; she was very swollen and her skin turned purplish.  Over the course of

the next two weeks, she began to need her cellmate to help her put on clothes and

with bathing.  She also complained a number of times to prison officials of

symptoms including chest pains; numbness on the left side of her body, legs and

arms; dizziness; vomiting; nausea; constipation; and a possible kidney infection.

*Id.* at 540.  One of her fellow inmates also opined that the plaintiff was extremely

sick and it was "obvious to normal persons."  A short time afterward, Phillips was

found lying in her cell with blood coming out of her mouth from an injured lip.

She was dizzy, lethargic and nauseated.  Her medication dosage was modified, but

she was later found unconscious in her cell and never regained consciousness.  She

was pronounced dead at the hospital.  In assessing the objective prong of the

deliberate indifference test, the Sixth Circuit concluded that Ms. Phillips'

symptoms demonstrated a sufficiently serious medical condition which was "so

obvious that even a layperson would easily recognize the necessity for a doctor's

attention."  *Id*.

Though the facts leading up to Mr. Lee's death differ in varying degrees from those found in *Phillips*, the parallels are apparent.  And, viewing the facts in the light most favorable to the estate, the record is sufficient to support a finding that Mr. Lee had a serious medical need.  First, Mr. Lee was housed in the observation unit of the jail where inmates with medical issues and suicidal indications were placed.  As noted earlier, he reported during his initial health evaluation that he suffered from asthma and high blood pressure as well as a history of cancer.  During his May and July 2015 stints at the jail, he made consistent, albeit general and varied, complaints of physical malaise and continuing weakness.  The Corizon records show that he was hospitalized for seven days in May of 2015.  Two days before his death, he requested and was allowed to see the medical staff after complaining that he had stomach pains and was feeling "really bad."  The day before he died, he also reported that he did not "feel good."  On the morning of Mr. Lee's death, fellow inmate Miller observed him to be having trouble using the toilet, and was concerned enough to notify defendant Little.  Shortly thereafter, Mr. Lee was found to have defecated in his pants.  He was unable to walk to the shower unassisted, and defendant Little had to enlist the assistance of two other inmates to transport him.  Upon exiting the shower, Mr. Lee fell and cut his knee.  When seated on a chair outside the shower, he did not maintain an upright position and was apparently unable to walk back to

his cell even assisted.  Therefore, the assisting inmates sat him in a restraint chair and wheeled him back to his cell.  Once secure in his cell, the inmates laid him on his bunk and covered him with a blanket.  He lay there for roughly 25 minutes until defendant Little concluded that he simply was not himself and required medical attention.  Within 10 to 15 minutes of that observation Mr. Lee was cold to the touch with a weak pulse, and within minutes of that he was found seizing in his cell.  In the view of the undersigned, the above facts are such that a jury could reasonably conclude it was obvious that Mr. Lee had a serious medical need.

The question of whether Deputy Little was deliberately indifferent to Mr. Lee's serious medical need is less straightforward.  Indeed, the principle focus of the parties surrounds an approximately 2 ½-hour window on the morning of July 21, 2015; namely whether at any time before approximately 10:25 a.m., Deputy Little made the inference of a substantial risk to Mr. Lee based on his serious medical need, then ignored it rather than seeking medical attention.  In viewing the facts in the light most favorable to plaintiff, as discussed below, in the view of the undersigned, no reasonable jury could find that Deputy Little was deliberately indifferent to Mr. Lee's serious medical needs.

Deputy Little contends that he not only lacked any knowledge "clearly indicating the existence" of a serious medical need, but also insists that as soon as he had reason to believe that Mr. Lee was having a medical problem, he contacted

a nurse.  According to defendants, that is exactly what he is required to do.  By contacting a nurse, defendants assert that Deputy Little not only followed Genesee County policies and did his job, but he also fulfilled the constitutional requirement of providing medical attention to Mr. Lee.

Defendants also assert that there is no evidence to support a finding that Deputy Little should have acted sooner.  In fact, at the time he first contacted Nurse Bexton, the only trouble Mr. Lee exhibited was a generalized weakness and confusion.  It was not until Nurse Bexton left to consult with a supervisor that Mr. Lee appeared to suffer a seizure.  Defendants maintain that this was the first notice to Deputy Little of a "serious medical need."  His response was to call a code blue, which is the most urgent request for medical attention that can be delivered.  On this record, defendants assert that a reasonable jury could not find that Deputy Little exhibited "deliberate disregard" to Mr. Lee's serious medical needs.

Plaintiff paints a different picture of the facts leading up to Mr. Lee's death.  According to plaintiff, Mr. Lee's medical history and needs were known to the jail staff, including Deputy Little.  Little testified that he always reviewed the logs of the previous shift (the 6:00 p.m. to 6:00 a.m.) first thing when he arrived to begin his shift.  (Dkt. 58-2, Ex. A, p. 31).  The jail log for the 6:00 p.m. to 6:00 a.m. shift contains an entry on July 19th at 11:30 p.m. stating, "Complaining of feeling terrible."  (Dkt. 56-5, Ex. E, p. 151).  The medical log also contains the same entry

as the jail log "feeling terrible and like he was going to faint."  (Dkt. 58-7, Ex. F., Pg ID 916).  Deputy Little arrived for his shift July 21, 2015 at 5:50 a.m.  (Dkt. 58-6, Ex. E).  At 6:00 a.m. he checked Mr. Lee's cell during his visual floor check.  (Dkt. 58-2, Ex. A, p. 39).  Although the medical log for July 20, 2015 contains an entry noting that Lee complains that "he don't feel good," an entry Deputy Little would have reviewed prior to his floor check, plaintiff points out that Deputy Little makes no entry in the medical log or the jail log, and there is no evidence of any follow-up.  Plaintiff also points to evidence showing that Mr. Lee was too weak to walk to the shower without help, and that he fell trying to get out of the shower.  Additionally, Mr. Lee was helped to a chair and then fell out of the chair.  Deputy Little directed that Mr. Lee be placed into a restraint chair, taken back to his cell and covered with a blanket.  Yet, Deputy Little made no notation of these events in the logs.  Plaintiff posits that this information is known only as a result of the investigation and interviews that followed Mr. Lee's death.

According to plaintiff, Deputy Little demonstrated deliberate indifference considering that  he had the benefit and knowledge of the medical logs of the 19th and 20th; and he personally observed on the morning of the 21st, a very weak man unable to walk, unable to stand, and unable to sit in a chair.  Plaintiff maintains that no later than 10:00 a.m., Deputy Little should have called the nurse who was only 30 feet away, and his delay in seeking medical treatment violated Mr. Lee's Eighth

Amendment rights.  Indeed, plaintiff's expert opined that had medical intervention

started when it was obvious Mr. Lee was weak and in trouble, at the latest between

9 and 10 a.m., Mr. Lee would have had a chance to survive.[5]  (Dkt. 58-13, Ex. L).

Notwithstanding the sad and unfortunate turn of events, plaintiff has not

established a question of material fact regarding whether Deputy Little was

deliberately indifferent to a substantial risk of harm stemming from Mr. Lee's

serious medical need.  Based on the Court's finding that Mr. Lee's serious  medical

need was obvious, the undersigned concludes that there were facts from which

Little could infer a substantial risk of harm if Mr. Lee went untreated following his

return to his cell from the shower.  However, plaintiff has presented insufficient

evidence to conclude that a reasonable jury could find that Deputy Little in fact

made any such inference before his observations at 10:25 a.m.  Unlike the

corrections officers in *Phillips*, for whom the Sixth Circuit found sufficient

evidence of culpable minds to satisfy the subjective prong, there is no evidence

that Deputy Little breached protocol in responding to Mr. Lee or that he ignored

complaints from other inmates regarding Mr. Lee.  Indeed, the evidence indicates

that Little adhered to the training he received in that once he perceived a

---

[5] Notably, "the 'verifying medical evidence requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care.'" *Blackmore v. Kalamazoo Cnty*, 390 F.3d at 898.  The Court has deemed Mr. Lee's serious medical need to have been obvious, thus obviating the need for such evidence.

substantial risk of harm, he sought medical attention for Mr. Lee.  Additionally, rather than ignoring an inmate report of Mr. Lee's toileting problems, he tended to Mr. Lee, seeing that he was cleaned up following the toileting accident.  It is also notable that the information Deputy Little received from inmate Miller was not that Mr. Lee needed medical attention, as was the case in *Phillips* when a fellow inmate's urging of medical care on the plaintiff's behalf was ignored by officers. Furthermore, Mr. Lee himself did not request any medical attention.  And the evidence shows that he knew how to do so, as he had requested to see the nurse just two days before.  The log from that day showed that Mr. Lee saw Nurse Jessica, who took his vitals and noted that they were "all ok."  (Dkt. 56-7, Pg. ID 814).  Deputy Little's failure to appreciate the urgency of Mr. Lee's serious medical need until 25 minutes after his return to his cell does not rise above negligence, as discussed more fully below.

Accepting plaintiff's timeline of events, between 8 a.m. and 10 a.m., Deputy Little was aware that Mr. Lee had experienced trouble using the bathroom and had soiled himself; that he complained on previous shifts of not feeling well and feeling faint; that he had seen the nurse two days earlier; and that he had a history of weakness.  The only fact present between the 8 a.m. and 10 a.m. timeframe that was not present during the previous shifts was Mr. Lee's bathroom difficulty.  Though the parties disagree on precisely when Mr. Lee was taken to the

shower and when he was returned to his cell, and with whom, it is undisputed that

after learning that Mr. Lee had soiled himself, and that Deputy Little oversaw the

process of getting Mr. Lee cleaned up and showered.  He observed that Mr. Lee

was weak, had fallen twice, and needed to be wheeled from the shower area to his

cell because he could not walk on his own.  According to Deputy Little, none of

these behaviors was particularly unusual for Mr. Lee.  Little testified, "He

defecated on himself, and he appeared to be the same as he was any other day."

(Dkt. 56-6, Ex. F, p. 46).   Mr. Lee also made no medical complaints to him.  (*Id*.

at 59).  He therefore, did not perceive them to present any serious medical risk.

Plaintiff has not directed the Court's attention to, and there does not appear to be

any evidence in the record suggesting that Deputy Little's characterization of Mr.

Lee's "normal" was incorrect or not Deputy Little's genuine perception.  Indeed,

inmate Miller indicated that Mr. Lee laid in his bed most of the time.  (Dkt. 58-4,

Ex. D)

The question before the Court is whether at any time before 10:25 a.m., i.e.

the time when he summoned nurse Bexton, Deputy Little made the inference that

Mr. Lee was subject to a substantial risk of harm, and ignored it.  Plaintiff

maintains that Deputy Little should have contacted medical staff no later than

when Mr. Lee was placed in the restraint chair following his shower.  Plaintiff

maintains that this occurred sometime before 10 a.m., given plaintiff's position that

Mr. Lee was returned to his cell at 10 a.m.  There is no dispute that at

approximately 10:25 a.m., Deputy Little sought medical attention for Mr. Lee after

checking in on him at that time because he subjectively perceived that Mr. Lee was

"not himself."  Even accepting plaintiff's timeline, there is not sufficient evidence

on which a jury could rely to suggest that Deputy Little perceived the risk and

ignored it.

This is so because, as discussed, the evidence shows that Mr. Lee was

typically weak and typically walked slowly.  The defecation was also not a cause

for concern to Deputy Little because that was not an out of the ordinary occurrence

at the jail – and there is no evidence to suggest that such an occurrence typically

required medical attention.  Based on his training, Little indicated that he would

call healthcare if an inmate were "unresponsive, [having] breathing difficulties,

complaining of chest pains," but not simply based on an inmate's indicating that he

did not feel well or appearing to be weak or having trouble walking.  (Dkt. 56-6,

Ex. F, at pp. 58-59).  Nothing in this record suggests that Deputy Little perceived

these occurrences as serious medical needs and then ignored them.  Instead,

Deputy Little perceived that Mr. Lee required assistance to and from the shower

after soiling his pants, and he arranged for such assistance.  The timeline advanced

by both parties credits Deputy Little with recognizing Mr. Lee's need for medical

assistance within about 25 minutes of his return from the shower.  Because the

inquiry is subjective rather than objective, the Court must only consider evidence of what Deputy Little actually knew and the inferences he made.[6] Thus, viewing the facts in the light most favorable to plaintiff, the undersigned concludes that nothing alerted Deputy Little to a serious medical need until 10:25 a.m., at which time he called medical staff. Summary judgment in favor of Deputy Little is, therefore, appropriate on plaintiff's deliberate indifference claim.

## C. Qualified Immunity

The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his or her position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.

---

[6] In cases where there is no testimony about what inferences a defendant in fact drew, "a genuine issue of material facts as to deliberate indifference can be based on a strong showing on the objective component." *Roane*, 534 F.3d at 541. That is not the case here.

2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test in order to determine whether qualified immunity is applicable to a particular situation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first part of the test involves a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." *Id.* If the first question was resolved in the affirmative, then the court would decide "whether the right was clearly established." *Id.* If both questions are resolved in the affirmative, then the doctrine of qualified immunity would not apply and the case could proceed. Conversely, if the answer to either question is no, then qualified immunity obtains. The court may consider the questions in whichever order the court concludes makes the most sense. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right." *Folks v. Petit*, 676 Fed. Appx. 567, 569 (6th Cir. 2017) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015)).

As set forth above, the estate has not established that there is a genuine issue of material fact as to its claim that Deputy Little violated Mr. Lee's Eighth

Amendment rights.  Consequently, the claim fails to satisfy the first inquiry under qualified immunity analysis and Deputy Little is entitled to qualified immunity.

> D.    *Monell* Failure to Train

A plaintiff can make a *prima facie* case under § 1983 by showing that the municipality failed to train or supervise its employees.  *Canton v. Harris*, 489 U.S. 378 (1989).  However, the mere fact that an individual does not comply with a policy is not sufficient to hold the municipality liable under § 1983.  The inadequacy of training may only serve as the basis for § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of [the plaintiff]."  *Canton*, 489 U.S. at 388-89.  According to defendants, the County had a policy.  The policy required that Deputies notify Corizon if the Deputies became aware that an inmate had a serious medical condition.  Defendants maintain that the policy is constitutional on its face and that it complies with the Eighth Amendment.  Thus, they assert that there is no basis for *Monell* liability for either not having a policy or having an unconstitutional policy.  In addition, defendants assert that there is no basis for *Canton* liability for failing to train.  According to defendants, Deputy Little was trained to recognize when an inmate is having a medical problem and to notify Corizon.  He testified to that, and he produced documents showing that he had updated his training mere months before Mr. Lee's death.

It is well-established that "[a] defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citing *Monnell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). A plaintiff who sues a private or public corporation for constitutional violations under 42 U.S.C. § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street*, 102 F.3d at 818. The Sixth Circuit has held that like a municipal corporation, "[CMS's] liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights." *Starcher v. Corr. Med. Sys.*, *Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001). Liability may be premised on the existence of an express policy adopted by the appropriate authorities, or on the existence of a custom. *See Hamer v. Cnty. of Kent*, 2013 WL 8479414, at *2 (W.D. Mich. Nov. 6, 2013), *adopted by* 2014 WL 1276563 (W.D. Mich. Mar. 27, 2014). Alternatively, liability may be premised on a failure to institute a policy or the failure to train its employees. *Id.* However, liability exists under this theory only where the need to act is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the policy makers can reasonably be said to have been deliberately indifferent to the need. *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). To state a claim under a theory of "inaction," plaintiff must establish (1) the existence of a clear and

persistent pattern of constitutional violation by employees, (2) notice or

constructive notice on the part of the employer, (3) the employer's tacit approval of

the unconstitutional conduct, and (4) that the failure to act was the "moving force"

or direct causal link in the constitutional deprivation. *City of Canton*, 489 U.S. at

388-89; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir.

2005).

The District Court has held that to maintain a claim against Corizon, a

plaintiff must identify "official policies, the actions of officials with final decision

making authority, a policy of inadequate training or supervision, or a custom of

acquiescence of federal violations." *Colwell v. Corizon Healthcare*, *Inc.*, 2014 WL

66867464, at *9 (E.D. Mich. Nov. 26, 2014).  In *Colwell*, the court explained that

the illegal policies or customs must lead to violation of a constitutional or statutory

right in the case currently pending before the court. *Id*.  Moreover, as noted by the

Sixth Circuit: before reaching the issue of whether the municipality was

deliberately indifferent," the "plaintiff must demonstrate a constitutional violation

at the hands of an agent or employee of the municipality." *Fox v. DeSoto*, 489 F.3d

227, 238 (6th Cir. 2007); *see also Gray v. City of Detroit*, 399 F.3d 612, 617 (6th

Cir. 2005) (finding that municipal liability "must rest on a direct causal connection

between the policies or customs of the [local government entity] and the

constitutional injury to the plaintiff").

As in *Colwell*, plaintiff has failed to establish that any County employee --

here, Deputy Little -- violated Mr. Lee's constitutional rights.  Where plaintiff

cannot prove that there was an Eighth Amendment violation by an individual, there

is no basis for claiming that the individual's employer, here the County, had an

unconstitutional policy.  *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687

(6th Cir. 2001) ("If no constitutional violation by the individual defendants is

established, the municipal defendants cannot be held liable under § 1983.") (citing

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Meier v. Cnty. of

Presque Isle*, 2009 WL 1285849, at *3 (E.D. Mich. 2009) (collecting cases holding

that there is no municipal liability if the conduct of the individual defendants does

not violate plaintiff's constitutional rights), *aff'd*, 376 Fed. Appx. 524 (6th Cir.

2010).  Absent a constitutional violation by a subordinate, plaintiff cannot establish

that the County violated his constitutional rights.  As set forth above, the

undersigned has determined that Deputy Little was not deliberately indifferent to

plaintiff's medical needs.  As such, plaintiff's *Monell* claim cannot survive.[7]

The court notes that there may be a narrow exception where a municipality

can be liable under § 1983 even when a governmental actor is exonerated when the

---

[7] The undersigned acknowledges that a recently unpublished decision from the Sixth Circuit Court of Appeals appears to the contrary.  *McGaw v. Sevier Cty., Tennessee*, 2017 WL 4924676 (6th Cir. Oct. 31, 2017).  However, *McGaw* is distinguishable because the corrections officer dismissed from the action based on qualified immunity was different from the person or class of persons (medical professionals) that the plaintiff claimed had not been properly trained.

municipal liability is based on the actions of individuals other than those who are named as parties. *See Ford v. Grand Traverse Cty.*, 2006 WL 3613292, at *3 (W.D. Mich. Dec. 11, 2006) (citing *Bowman v. Correctional Corp. of Am.*, 350 F.3d 537, 545 (6th Cir. 2003)). In *Ford*, the District Court noted situations where "the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability." *Id*. at 3. In *Ford*, a plaintiff alleged that defendants violated her constitutional rights in that they were deliberately indifferent to her serious medical needs. The case proceeded to trial, and the jury returned a special verdict, finding the defendant County was deliberately indifferent to the medical needs of plaintiff through its policy or custom regarding weekend medical care and that the policy was a proximate cause of plaintiff's injury. The jury further concluded that none of the individual corrections officers were deliberately indifferent to plaintiff's serious medical needs. The defendant County subsequently filed a motion for judgment as a matter of law on the ground that a municipality cannot be held liable under § 1983 unless a constitutional violation by its agents is first established. The District Court denied the County's motion because defendant failed to advance its arguments regarding municipal liability in the pre-verdict motion. Moreover, defendant submitted the special verdict form used by the jury in resolving liability. The form

allowed for a verdict against the County, regardless of the findings made as to the

individual defendants.  In *Bowman*, while acknowledging that such a situation

could exist, the Sixth Circuit determined that the case before it did not present a

situation sufficient to establish municipal liability.  The *Bowman* court went on to

conclude that even if a policy is unconstitutional, there must be a violation of an

individual's constitutional rights for municipal liability to be imposed.  *Ford*, 2006

WL at *3 (citing *Bowman*, 350 F.3d at 545).  Importantly, plaintiff does not

advance that this exception applies here.

      E.      <u>Governmental Immunity/Gross Negligence</u>

Plaintiff appears only to claim "gross negligence" under Michigan law.

While the complaint alleges an intentional infliction of emotional distress claim,

plaintiff appears to have abandoned that claim in the response to the motion for

summary judgment.[8]

Defendants contend that plaintiff's state claim is barred by state

governmental immunity.  As to the County, it contends that the state law claim

against it is barred by Michigan statute, which provides that governmental agencies

are immune from tort liability if the governmental agency is engaged in the

---

[8] "Intentional infliction of emotional distress" is mentioned in the questions presented of plaintiff's brief, but is not discussed in the body of the brief.  (Dkt. 58, pp. ii, 15).  Further, plaintiff specifically argues that summary judgment as to Count III should be denied (*id.*) but does not mention or defend Count IV, which is the IIED claim.

exercise or discharge of a governmental function. Mich. Comp. Laws § 691.1407.

There are four exceptions to the application of state governmental immunity: the

public highway (Mich. Comp. Laws § 691.1402), the negligent operation of a

motor vehicle (Mich. Comp. Laws § 691.1405), defective buildings (Mich. Comp.

Laws § 691.1406), and medical malpractice claims against state owned hospitals

(Mich. Comp. Laws § 691.1407). None of those exceptions apply in this case, so

the only question for the Court with respect to the County is whether it was

involved in the exercise or discharge of a governmental function. It is well

established under Michigan law "'that the management, operation and control of a

police department is a governmental function and that tort actions against a

municipality based on the negligence of its police officers, occurring while the

officer is engaged in a discharge of that function, are barred by the doctrine of

governmental immunity.'" *Leverette v. Genesee Co*., 2014 WL 2558655, at *24

(E.D. Mich. June 6, 2014) (quoting *Garretson v. City of Madison Heights*, 407

F.3d 789, 800 (6th Cir. 2005) (quoting *Moore v. City of Detroit*, 128 Mich. App.

491 (1983)).

This case arises from the operation of the Genesee County Jail, a function

overseen by the head of county law enforcement, the Sheriff, and the actions of

one of the sheriff's deputies. *See Long v. Cty. of Saginaw*, 2014 WL 1845811, at

*8 (E.D. Mich. May 8, 2014) (Michigan Comp. Law § 51.75 explicitly provides

that "[t]he sheriff shall have the charge and custody of the jails of his county, and of the prisoners in the same...." and in matters pertaining to the conditions of jails and to the operation of deputies, the sheriff is the policymaker for the county.); Mich. Comp. Laws § 51.281 (sheriff prescribes rules and regulations for conduct of prisoners); *Kroes v. Smith*, 540 F.Supp. 1295, 1298 (E.D. Mich. 1982) (the sheriff of "a given county is the only official with direct control over the duties, responsibilities, and methods of operation of deputy sheriffs"). Clearly the operation of the jail is a governmental function. As such, Genesee County is immune from tort liability. Since gross negligence is a tort, the Court agrees with the County that plaintiff's state law claim against the County is barred by governmental immunity.

As to the state law claim against Deputy Little, defendants rely on *Odom v. Wayne County*, 482 Mich. 459 (2008). *Odom* was a false imprisonment and malicious prosecution case. The issue was whether there is immunity from liability for intentional torts. *Odom* found that there was immunity for intentional torts so long as the defendant was acting within the scope of his authority, he acted in good faith, and he had discretion to act. In this case, defendants maintain that Little was acting within the scope of his authority as a Deputy Sheriff when he checked on Mr. Lee and ultimately contacted Corizon. Defendants assert that his decision to contact Corizon was discretionary. It depended on his evaluation of

Mr. Lee's condition.  Whether he was right or wrong, or should have acted sooner, there is no evidence to suggest that he acted in bad faith.  He was concerned about Mr. Lee's welfare and contacted a nurse to check on the Mr. Lee pursuant to his training.  Under these facts, defendants maintain that Deputy Little is entitled to governmental immunity, both for the gross negligence claim and the intentional infliction of emotional distress claim.

According to plaintiff on the other hand, where there is a question of fact with respect to "deliberate indifference," there must also be a question of fact as to gross negligence, which is defined under Michigan tort law, as a quantifiably lesser standard than "deliberate indifference."  Plaintiff also contends that there is a factual question as to "willful blindness" by Deputy Little to Mr. Lee's serious medical condition because a jury could believe Deputy Little's conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

As set forth in footnote 6, it appears that only plaintiff's gross negligence claim, and not the intentional infliction of emotional distress claim, is at issue. But, defendant makes the same argument as to both claims, arguing that they are barred by *Odom*.  A review of the Michigan of governmental immunity is helpful to this analysis.  Michigan law offers government employees immunity from tort liability under certain circumstances.  Mich. Comp. Laws § 691.1407(2). Defendants are immune from liability if they acted or reasonably believed they

acted within the scope of their employment, while engaged in the discharge of a

government function, and their conduct did not amount to gross negligence that

was the proximate cause of the injury or damages.  *Id*.  In Michigan, government

employees can be held liable for gross negligence.  Mich. Comp. Laws

§ 691.1407(2)(c).  Gross negligence is defined by statute as "conduct so reckless as

to demonstrate a substantial lack of concern for whether an injury results."  Mich.

Comp. Laws § 691.1407(7)(a).  To the extent that Deputy Little argues that the

gross negligence claim is barred by *Odom* (which provides governmental

immunity for intentional torts when certain criteria are met) that argument was

rejected in *Murphy v. Bonn*, 2014 WL 4187806 (W.D. Mich. 2014) (M.J. Scoville),

adopted in relevant part by 2014 WL 4187718, *1 (W.D. Mich. 2014) (J.

Maloney).

In *Murphy v. Bonn*, the defendant relied on the principle that a gross

negligence claim will not lie for intentional misconduct, citing *VanVorous v.

Burmeister*, 262 Mich. App. 467, 483-84 (2004); *see also Thelonious Jackson v.

Daniel Lubelan & Platt R. Weinrick*, 2018 WL 3309610, at *2 (Mich. Ct. App.

July 5, 2018) ("It is well-established that a claim alleging injury based on an

intentional tort cannot be brought as a 'gross negligence' claim.").  The defendant

in *Murphy v. Bonn* argued that because "plaintiff's deliberate-indifference claim is

the equivalent of an intentional tort ... [h]e cannot sue for gross negligence."  *Id*.

The *Murphy* court concluded that Michigan law was to the contrary as set forth in

the published decision *Bell v. Porter*, 739 F.Supp.2d 1005 (W.D. Mich. 2010)

(Bell, J.).  In *Bell v. Porter*, the court rejected the expansive interpretation of the

*VanVorous* decision similarly advanced in *Murphy v. Bonn*.  The *Bell* court held

that the plaintiff's gross negligence claim was not barred by *VanVorous,* and

denied the defendant's motion for summary judgment.  *Id*. at 1014-16.  Judge Bell,

Magistrate Judge Scoville, and Judge Maloney all concluded that conduct that is

deliberately indifferent is <u>not</u> necessarily intentional.  *See Murphy v. Bonn* and *Bell*

*v. Porter*.  As the court further observed in *Murphy v. Bonn*, the Sixth Circuit has

held that gross negligence under Michigan law is <u>equivalent</u> to deliberate

indifference under an Eighth Amendment analysis.  *See Quigley v. Thai*, 707 F.3d

675, 686 (6th Cir. 2013).  That is, the claims of gross negligence and deliberate

indifference rise or fall together.  *Kindl v. City of Berkley*, 798 F.3d 391, 404 (6th

Cir. 2015) (The Sixth Circuit affirmed the denial of summary judgment on the

defense of governmental immunity to a gross negligence claim where summary

judgment on a deliberate indifference/denial of medical care claim was also

denied.).  Thus, while Deputy Little is not entitled to immunity under *Odom*

because deliberate indifference does not equate to intentional conduct, the

undersigned concludes that plaintiff's gross negligence claim against Deputy Little

must fail for the same reasons as his deliberate indifference claim.

## IV.   RECOMMENDATION

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 15, 2018          s/Stephanie Dawkins Davis
                               Stephanie Dawkins Davis
                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on August 15, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov