UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIKA LEE, Personal Representative of
the Estate of JOSEPH LEE,                          Case No. 16-13116

             Plaintiff,               SENIOR UNITED STATES DISTRICT
v.                                                 JUDGE ARTHUR J. TARNOW

COUNTY OF GENESEE, ET AL.,                         MAGISTRATE JUDGE STEPHANIE
                                                   DAWKINS DAVIS
           Defendants.
_____/

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION [66]; SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFF'S OBJECTIONS [67]; AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [56]**

On August 29, 2016, Plaintiff Erika Lee, through counsel, filed this prisoner civil rights action on behalf of her father, Joseph Lee, who was incarcerated at the Genesee County Jail at the time of his death. Defendants Genesee County and Deputy Steve Little filed this Motion for Summary Judgment [56] on November 14, 2017. On August 15, 2018, the Magistrate Judge issued a Report and Recommendation ("R&R") [66] recommending that the Court grant summary judgment and dismiss the case. Plaintiff filed Objections [67] to the R&R on August 29, 2018.

For the reasons stated below, the R&R [66] is **ADOPTED in part**; Plaintiff's Objections [67] are **SUSTAINED in part and OVERRULED in part**; and

Defendants' Motion for Summary Judgment [56] is **GRANTED in part and DENIED in part**.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court adopts the facts of this case as set forth in the R&R:

Joseph Lee, at 77 years old, died while in the custody of the Genesee County Jail on July 21, 2015. He was initially incarcerated earlier that year on March 3, 2015, then released and reincarcerated two more times. Mr. Lee was in the jail between March 3 and May 7, 2015, then again from May 22 to June 11, 2015, and finally again from July 2 until July 21, 2015. Thus, all told, he spent about three and a half months in the Genesee County jail . . . .

When Mr. Lee arrived at the jail, he underwent a health physical and an initial medical evaluation by Corizon personnel. Mr. Lee disclosed that he had asthma and hypertension, and that he previously had cancer. Mr. Lee did not disclose any history of cardiovascular disease. Mr. Lee was housed on a medical floor, where the jail lodged elderly inmates, inmates with injuries, and inmates with mental deficiencies.

During Mr. Lee's time in the jail, he received regular medical treatment from Corizon staff . . . . Defendants also highlight a few recurring issues found in the medical records. Mr. Lee refused to eat the food (because he could not eat the seasoning); he was weak and losing weight; and on occasion, he appeared to be confused . . . .

On May 6, [Mr. Lee] was found to have a decreased appetite, to be losing weight, and to have an "overall condition decline." On May 7, he was weak, not drinking, and seemed confused. On that same date, Corizon staff sent him to Hurley Hospital to be evaluated because he was getting dehydrated . . . . By May 12, after being at Hurley for seven days, he was dehydrated and had acquired pneumonia. He recovered and was returned to jail on May 22 . . . .

On July 21, 2015, Deputy Little was working in the jail, on duty in the area where Mr. Lee was housed. He maintains that he never saw any of

Mr. Lee's medical records and knew nothing about Mr. Lee's medical history, or whether Mr. Lee was suffering from any chronic medical conditions. He also did not know any details about Mr. Lee's complaints to Corizon, or what Corizon was doing to treat Mr. Lee. Deputy Little did know who Mr. Lee was, that he did not eat well, and that he complained generally of weakness. He also knew that Corizon had been prescribing protein shakes to Mr. Lee for his weakness. Deputy Little assumed that this simply was due to Mr. Lee's age.

As a rule, the deputy on duty where Mr. Lee was lodged checked on the inmates regularly and recorded complaints and observations in a log. Deputy Little testified that it was customary for him to review the log from the night before when he arrived on duty . . . . defendants posit that, for the purposes of this motion, the Court can assume that Deputy Little was generally aware of what other deputies had previously written about Mr. Lee.

The observation log begins on July 7. On July 9, it indicates that Mr. Lee had trouble eating breakfast. On July 11, Mr. Lee reported that he was not feeling well, and the deputy who was on duty contacted Corizon. There is a corresponding entry in Corizon's medical records. On July 14, it states that Mr. Lee ate very little and slept most of the day. On July 19, Mr. Lee complained "of feeling terrible and like he was going to feint (sic)." The deputy on staff contacted a nurse, who evaluated Mr. Lee. There is a corresponding note in Corizon's medical records. Finally, the last entry before Mr. Lee died was made the day before, on July 20. It indicates that Mr. Lee complained that he "dont feel good [sic]."

. . . . On the morning of July 21, at approximately 10:00 a.m., according to Deputy Little, Mr. Lee yelled for help. Deputy Little responded and observed that Mr. Lee had defecated in his pants. Deputy Little testified that this is not an unusual occurrence in the jail. He offered Mr. Lee a shower and clean clothes; he let Mr. Lee out of his cell, and enlisted inmate housing unit workers to help Mr. Lee to the shower.

When Mr. Lee got out of the shower, he stumbled. Mr. Lee seemed weak and had trouble walking. Plaintiff asserts that as Andrew Farley, one of the inmate housing unit workers, helped Lee sit in a chair, Mr. Lee "fainted" from the chair onto the floor. However, Mr. Farley's interview

statement does not mention anything about "fainting." Mr. Farley did observe Mr. Lee fall twice - once when getting out of the shower and once after being seated in a chair.

Plaintiff also asserts that Deputy Little "instructed Miller and Farley to tie Lee down in a restraint chair" and take him back to his cell. However, Mr. Farley's statement only says that, "under the direction of Deputy Little," he and Mr. Miller "then used the restraint chair to wheel Lee from the shower back to cell number five."

. . . . Plaintiff maintains that Deputy Little was aware that Mr. Lee was having problems earlier than 10 a.m. According to the interview of inmate Paul Miller conducted by Sgt. Kariann Nelson on July 23, 2015, Mr. Miller heard Mr. Lee knocking on his cell door between 8-9 a.m. and said he was having "trouble." Mr. Miller approached Mr. Lee's cell and could see through the window that Mr. Lee was sitting on the toilet. Mr. Miller thought Mr. Lee was having trouble going to the bathroom and informed Deputy Little of the situation.

At approximately 10:20 a.m., according to Mr. Miller's statement, Mr. Farley and Mr. Miller wheeled Mr. Lee back to his cell, laid him on the bunk, and covered him with a blanket.

However, the record lacks clarity about when Mr. Lee was taken [back] to his cell and by whom. Deputy Little testified that he believes he returned Mr. Lee to his cell around 10 a.m., but Deputy Little also testified that 10 a.m. was when Mr. Lee was yelling for help, had defecated in his pants, and was taken to the shower. Mr. Miller's statement does not mention that Deputy Little was with him and Mr. Farley when they wheeled Mr. Lee back to his cell at 10:20 a.m. Thus, Deputy Little's testimony is a bit confusing and inconsistent on these points, and differs in some respects from his contemporaneous report of the timeline. At the hearing on this motion, plaintiff's counsel maintained that Mr. Lee was returned to his cell at 10 a.m. and that it was wrong for Deputy Little not to call for medical help at that time.

This confusion about the timeline also leads to a disagreement about what happened at 10:25 a.m. At the hearing, defendants' counsel maintained that Deputy Little took Mr. Lee back to the cell at 10:25 a.m.

and called Nurse Bexton at that point, when he observed that Mr. Lee
did not seem like himself. More particularly, at 10:25 a.m., Deputy Little
conducted a floor check. At that time, according to Deputy Little's
incident report, he thought Mr. Lee did not seem like himself, so he
contacted John Bexton, the Corizon nurse who was on shift. Deputy
Little says he made the phone call at about 10:25 a.m., about 25 minutes
after he first encountered Mr. Lee that morning. Nurse Bexton arrived
about five minutes later, around 10:30 a.m. Deputy Little left Mr. Lee's
cell to open the doors to the department and let nurse Bexton into the
cell.

When he returned to Mr. Lee's cell with nurse Bexton, he says that Mr.
Lee's condition had changed. Mr. Lee's pulse was weak, his respiration
was shallow, and he did not respond to nurse Bexton. Nurse Bexton left
to consult with his supervisor in the medical department. Nurse Bexton
returned 10 minutes later, at about 10:40 a.m. with a plan for nurse
Bexton to take Mr. Lee to the medical department for further evaluation
and observation. However, when Deputy Little and nurse Bexton
returned to Mr. Lee's cell, they observed Mr. Lee experiencing what
they believed to be a seizure. Deputy Little called a code blue at 10:43
a.m.

According to the investigation report, Mr. Lee was transported by
ambulance to Hurley Hospital, and was in cardiac arrest on his arrival at
Hurley. The medical personnel at Hurley successfully resuscitated Mr.
Lee. However, Mr. Lee passed away later that night, at around 6:39 p.m.
His cause of death was atherosclerotic cardiovascular disease . . . .

[R&R at 2-9] (internal citations and footnotes omitted).

On August 29, 2016, Plaintiff Erika Lee commenced this action on behalf of

her father's Estate against Defendants Genesee County, Deputy Steve Little, and

Nurse John Bexton alleging deliberate indifference to Mr. Lee's medical needs in

violation of the Eighth and Fourteenth Amendments and state law claims of gross

negligence and intentional infliction of emotional distress. The Court granted Plaintiff's Motion to Dismiss Defendant Bexton [25] on April 21, 2017.

Remaining Defendants filed this Motion for Summary Judgment [56] on November 14, 2017. Plaintiff filed a Response [58] on December 14, 2017. The Magistrate Judge held a hearing on the Motion on March 6, 2018.

On August 15, 2018, the Magistrate Judge issued this R&R [66] recommending that the Court grant Defendants' Motion. Plaintiff filed Objections [67] to the R&R on August 29, 2018.

## STANDARD OF REVIEW

This Court reviews *de novo* the portions of the R&R to which objections have been filed. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id*.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must construe the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue for trial exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

ANALYSIS

## I.      Report & Recommendation [66]

The Court focuses on Section III of the R&R in which the Magistrate Judge analyzes Plaintiff's claims for relief. The R&R first assesses Plaintiff's Eighth and Fourteenth Amendment claims that Deputy Little was deliberately indifferent to Mr. Lee's serious medical needs. In Section III-B-1, the R&R sets forth the legal framework which guides the Court's analysis of deliberate indifference claims. As noted by the Magistrate Judge, this framework requires that Plaintiff allege both an objective component – a "sufficiently serious" medical need; and, a subjective component – that the officer subjectively perceived a substantial risk of harm and disregarded that risk.

The R&R concluded that Plaintiff had satisfied the objective component because a jury could reasonably find that, viewing the facts in Plaintiff's favor, Mr. Lee had a serious medical need that obviously warranted attention. Nonetheless, the R&R went on to conclude that Plaintiff had not satisfied the subjective component because no reasonable jury could find that, before 10:25 a.m., Deputy Little made the inference that Mr. Lee was subject to a substantial risk of harm and ignored that risk. [R&R at 24].

The R&R mentions a few facts of record to support its finding that Deputy Little could not have perceived a risk of harm. First, that Mr. Lee was typically weak and walked slowly; second, that defecation in one's pants was not out of the ordinary at the Jail; and third, that Deputy Little usually called healthcare only when an inmate was unresponsive, having breathing difficulties, or complaining of chest pain. [R&R at 25]. Because Plaintiff failed to allege sufficient facts to satisfy the subjective component of its deliberate indifference claim, the R&R also found that Plaintiff could show no violation of a constitutional right for purposes of overcoming qualified immunity and establishing municipal liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

With respect to Plaintiff's state law claims, the R&R concluded that Plaintiff's gross negligence claim fails because "claims of gross negligence and deliberate indifference rise or fall together," [R&R at 38], and further concluded that Plaintiff's intentional infliction of emotional distress claim fails because Plaintiff did not respond to Defendants' argument for dismissal. Ultimately, the R&R recommended that the Court grant summary judgment for Defendants and dismiss the case.

The Court adopts the portions of the R&R setting forth the applicable standard of review and legal standards, namely Sections III-A and B-1. The Court further adopts the first part of Section III-B-2, in which the Magistrate Judge found that Plaintiff alleged a serious medical need for purposes of satisfying the objective prong

of the deliberate indifference framework. Finally, the Court adopts the R&R's recommendation to dismiss the gross negligence claim against the County and the intentional infliction of emotional distress claim in its entirety.

However, the Court declines to adopt the second portion of Section III-B-2 in which the Magistrate Judge found that Plaintiff had failed to satisfy the subjective prong of the deliberate indifference framework. As explained further below, this is because the analysis errs in one chief respect – the Magistrate Judge did not construe the facts in the light most favorable to Plaintiff as required under Rule 56. As such, the Court cannot adopt the conclusions in Section III-C, D, and E.

## II.    Plaintiff's Objections [67]

### A. Deliberate indifference

In Objections #1, #2, and #5, Plaintiff objects on the grounds that the Magistrate Judge failed to construe the facts in the light most favorable to the Estate in analyzing its deliberate indifference claim. Specifically, Plaintiff submits that it was entitled to the reasonable inference that Mr. Lee was tied to the restraint chair (Objection #1) and that Mr. Lee could have survived had Deputy Little sought medical assistance before 10:25AM (Objection #2). Plaintiff further submits that, at a minimum, a fact question exists as to whether Deputy Little appreciated the urgency of Mr. Lee's serious medical needs (Objection #5).

Plaintiff argues that the Magistrate Judge seems to have required direct evidence of Deputy Little's culpable state of mind to demonstrate deliberate indifference, notwithstanding the fact that circumstantial evidence is sufficient. *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (noting that "a factfinder may infer actual knowledge through circumstantial evidence, or may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious." (internal citation and quotation marks omitted))).

The Court agrees. In its analysis, the R&R asks the appropriate question – "whether at any time before 10:25 a.m., i.e. the time when he summoned [N]urse Bexton, Deputy Little made the inference that Mr. Lee was subject to a substantial risk of harm, and ignored it." [R&R at 24]. However, based on all of the facts presented, the Court finds that the R&R erred in answering this question.

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Little was aware of Mr. Lee's serious need for medical attention long before 10:25AM. In fact, sometime between 8AM and 9AM on July 21, 2015, Mr. Lee had signaled for help. He told Trustee Paul Miller that he was having trouble, and shortly thereafter, Miller informed Deputy Little of the situation. Interview with Paul Miller, Observation Holding Unit of the Genesee County Jail (July 21, 2015).

Thus, Deputy Little was aware – as early as 8AM – that Mr. Lee was in trouble. Nonetheless, he did not visit Mr. Lee in his cell until nearly 10AM, and this was only after Mr. Lee had yelled for help. Steve Little Dep. 46:5-10, Sep. 28. 2017. At that point, Deputy Little observed that Mr. Lee had defecated in his pants. Deputy Little asked Trustees Andrew Farley and Paul Miller help Mr. Lee to the shower. When Mr. Lee fell attempting to get out of the shower, Farley sat Mr. Lee in a chair next to the shower. When Mr. Lee fell again, this time off of the chair, Deputy Little told Farley and Miller to use the restraint chair to wheel him back to his cell. Interview with Andrew Farley, Observation Holding Unit of the Genesee County Jail (July 21, 2015). According to Deputy Little's deposition, Mr. Lee was returned to his cell by 10AM, at which time Farley had to help Mr. Lee into his bed.

Despite having observed that Mr. Lee had defecated in his pants, required the assistance of two men to get to and from the shower, fallen twice and as a result, needed to be tied to a restraint chair for transportation to back his cell, and needed help to get into his bed, Deputy Little left Mr. Lee alone in his cell. Notably, notwithstanding these warning signs, Deputy Little made the conscious decision not to call for medical assistance from the nurse's station, located a mere thirty steps away. John Bexton Dep. 9:10-14, Aug. 21, 2017. Only after he circled back at 10:25AM, not necessarily to check on Mr. Lee, but to perform a routine floor check, did Deputy Little note that Mr. Lee did not "seem like himself" and contacted Nurse Bexton.

Page **11** of **17**

A reasonable jury could conclude that Deputy Little knew of a substantial risk of harm the minute he saw that Mr. Lee, a grown man, had defecated in his pants. Despite Deputy Little's testimony that this is an ordinary occurrence in jail, common sense tells us that this is an abnormal incident warranting medical attention. This is especially so where, as here, Deputy Little had no information to suggest that Mr. Lee previously experienced difficulty using the toilet. He did, however, have information that Mr. Lee was 77-years-old and had not been feeling well over the past few days, both factors which would have justified heightened observation of Mr. Lee. Because a fact question exists as to whether Deputy Little disregarded a substantial risk of harm to Mr. Lee in deciding to wait until 10:25AM to call for medical assistance, summary judgment is not warranted. Objections #1, #2, and #5 are sustained.

### B. Qualified immunity

In Objection #7, Plaintiff maintains that the R&R erred in finding that Deputy Little was entitled to qualified immunity. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal citations omitted).

Qualified immunity analysis involves two questions: (1) whether the defendant violated a constitutional right; and (2) whether the right was clearly established such

Page **12** of **17**

that a reasonable person in the defendant's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 121 (2001).

First, as stated previously, there is at least a question of fact as to whether Deputy Little violated Mr. Lee's rights under the Eighth and Fourteenth Amendments. Second, the constitutional right of a prisoner to be free from an officer's deliberate indifference to his serious medical needs has been clearly established for decades. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983). Moreover, a reasonable officer in Deputy Little's position would know that Mr. Lee had a constitutional right to be free from cruel and unusual punishment, including deliberate indifference to his serious medical needs. Accordingly, viewing the facts in the light most favorable to Plaintiff, Deputy Little is not entitled to qualified immunity. Objection #7 is sustained.

## C. Failure to train (*Monell*)

In Objections #3, #4, #6, #8, Plaintiff objects to the R&R's finding that Plaintiff failed to present sufficient evidence to establish municipal liability under 42 U.S.C § 1983. Plaintiff maintains that the validity of the Jail's policy and quality of officer-training, including the training of Deputy Little in particular, were questions for the jury.

A municipal party may only be sued under § 1983 if a claimant is harmed by execution of an unconstitutional policy or custom. *Monell*, 436 U.S. at 694. Relying

on *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), Plaintiff argues that Defendant Genesee County should be liable for its failure to train Deputy Little on addressing the medical needs of inmates at the Jail.

To prevail on a failure to train or supervise theory, Plaintiff must establish that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The Court is troubled by the fact that Defendant Genesee County, admittedly, does not have a written policy instructing its officers how to address the medical needs of its inmates. Nonetheless, in a sworn Affidavit, Jason Gould, Captain in the Genesee County Office of the Sheriff, stated that although not written, the Genesee County Jail has a policy in place for addressing prisoners' medical needs. According to Gould, the policy, on which the officers receive training, requires a deputy to notify Corizon when he becomes aware of a medical problem.

Corroborating this evidence is Deputy Little's testimony that the Jail has a policy that provides that deputies are supposed to notify medical when an inmate complains about, or when a deputy observes, a medical problem. Little Dep. 54:1-6. Deputy Little further testified that he was trained on how to recognize when someone

needs medical attention and how to identify severe medical problems such as breathing difficulties and chest pains. *Id.* at 57:19-25; 58:1-3.

Plaintiff, on the other hand, does not point to any evidence to demonstrate that Deputy Little's training was somehow inadequate or that the alleged inadequacy was due to the County's deliberate indifference. To prevent summary judgment, there must be some genuine dispute of fact. Plaintiff simply asserts that the issue of the adequacy of training should be decided by the jury. But without any deposition or other evidence to support its argument, Plaintiff cannot prevail on this claim. *See, e.g.*, *Nallani v. Wayne Cnty.*, 665 F. App'x 498, 513 (6th Cir. 2016) (noting that deposition evidence that deputies at the jail did not receive any formal training on how to deal with psychological problems may be sufficient to establish a genuine fact issue for purposes of *Monell* liability). Plaintiff seems to be proffering a *respondeat superior* liability theory, which is unavailable for § 1983 claims. *Monell*, 436 U.S. at 690. As such, Objections #3, #4, #6, and #8 are overruled.

### D. Gross negligence

In Objection #9, Plaintiff contends that because the R&R erred in ruling against it on the deliberate indifference claim, the R&R similarly erred in ruling against Plaintiff on its gross negligence claim.

The Court agrees. The standard for deliberate indifference is more stringent than the standard for gross negligence. *Jones v. Muskegon Cnty.*, 625 F.3d 935, 947

(6th Cir. 2010). Given that Plaintiff has provided sufficient evidence to survive summary judgment on the deliberate indifference claim against Deputy Little, Plaintiff clearly satisfies the lower standard for gross negligence at this stage. Therefore, Objection #9 is sustained.

CONCLUSION

For the reasons stated above, the Court **ADOPTS in part the R&R** [66]; **SUSTAINS in part and OVERRULES in part** Plaintiff's Objections [67]; and **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment [56].

This ruling has the effect of dismissing Counts II and VI and dismissing Defendant Genesee County. Remaining in this action are Counts I and III against Deputy Little.

Accordingly,

**IT IS ORDERED** that the R&R [66] is **ADOPTED in part**.

**IT IS FURTHER ORDERED** that Plaintiff's Objections [67] are **SUSTAINED in part and OVERRULED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [56] is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Counts II and IV are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant Genesee County is **DISMISSED**.

**SO ORDERED**.

<u>s/Arthur J. Tarnow</u>
Arthur J. Tarnow
Dated: September 19, 2018     Senior United States District Judge

Page **17** of **17**